IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN LEWIS, JR., | ) |
| | ) |
| Plaintiff, | ) Case No. 1:16-00088 (ERIE) |
| | ) |
| vs. | ) |
| | ) RICHARD A. LANZILLO |
| WEXFORD HEALTH SOURCES, INC., | ) UNITED STATES MAGISTRATE JUDGE |
| CORRECT CARE SOLUTIONS, INC., | ) |
| and D.O. ROBERT L. MAXA, | ) |
| | ) MEMORANDUM OPINION ON MOTION |
| Defendants | ) FOR SUMMARY JUDGMENT |
| | ) [ECF No. 42] |
| | ) |

I.    Introduction

This matter comes before the Court on the Motion of Defendants Wexford Health

Sources, Inc. (Wexford), Correct Care Solutions, Inc. (Correct Care), and D.O. Robert L. Maxa

(Maxa) for Summary Judgment. ECF No. 42. Plaintiff John Lewis, Jr., opposes the motion.

ECF No. 45. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343. All

parties have consented to the jurisdiction of a United States Magistrate Judge. ECF No. 16; ECF

No. 18. *See also* 28 U.S.C. § 636(c).

The principal issue to be decided is whether Maxa's conduct in treating Lewis' pain from

his prior neck and spine surgery amounted to deliberate indifference. After careful consideration

of the entire record, the Court determines that no genuine issue of material fact remains

concerning this issue and that Maxa is entitled to judgment as a matter of law on Lewis' Eighth

Amendment claim. The Court will therefore grant summary judgment in favor of Maxa on this

claim. Lewis' state law negligence claims against all Defendants will be dismissed without

prejudice to his right to refile those claims in an appropriate state court.

1

II.    Background

    A.    Procedural History

    Lewis filed a civil complaint alleging Defendants violated his Eighth Amendment right to adequate medical care by, among other things, their deliberate indifference to his serious medical needs. ECF No. 1. Defendants answered the Complaint, raising various affirmative defenses. ECF No. 12. Lewis then filed an Amended Complaint, which pleaded additional factual details about the medical treatment provided by Maxa and a new claim for breach of contract. *See* ECF No. 21. Specifically, Lewis' Amended Complaint contained three counts: Count I, an Eighth Amendment claim of deliberate indifference to serious medical needs asserted against Maxa; Count II, a pendent state law professional negligence claim against all Defendants; and Count III, a pendent state law breach of contract claim against Defendants Wexford and Correct Care.

    Defendants moved to dismiss two claims of the Amended Complaint. ECF No. 22. They argued first that Lewis was not a third-party beneficiary of the contracts between the Commonwealth of Pennsylvania and Wexford or Correct Care and, therefore, he lacked standing to bring a claim for breach of contract (Count III of the Amended Complaint). ECF No. 23, at 5-10. Next, Defendants argued that Lewis' Amended Complaint failed to allege deliberate indifference to a serious medical need for which he may pursue an Eighth Amendment claim under §1983 (Count I). *Id.* at 10-18. Defendants did not move to dismiss Lewis' state law professional negligence claim. Lewis voluntarily withdrew his breach of contract claim as stated in Count III of the Amended Complaint. ECF No. 25.

    This Court refused to dismiss Lewis' Eighth Amendment claim, finding that the claim was based not on a mere dispute over a choice of pain medication, but "on the broader issue of Defendants' failure to provide specialty care for his chronic pain." ECF No. 26, at 7 (citing ECF No. 21, at ¶¶ 37-38). The Court found that the allegations associated with this claim were

2

minimally sufficient to state a claim of deliberate indifference to Lewis' medical needs. ECF No. 26, at 8. Defendants now move for summary judgment on the Eighth Amendment claim. Lewis asserts that there are factual questions requiring resolution by a jury.

B     Allegations in the Complaint

Lewis alleged in his Amended Complaint that he was involved in a motorcycle accident before being incarcerated at SCI-Albion and that, as a result of the accident, he suffered severe spinal injuries requiring four neck and back surgeries, which rendered him permanently disabled. ECF No. 21, at ¶ 15. Lewis' surgeon referred him to the Hershey Medical Center Pain Management Clinic where he was prescribed Methadone and Soma to manage his chronic pain symptoms. *Id.* at ¶ 16. Lewis' primary care physician, Larien G. Bieber, M.D., continued to treat his chronic pain with the prescription narcotics Methadone and Soma. *Id.* at ¶ 17.

After Lewis began his incarceration at SCI-Albion, Dr. Bieber sent a letter to Defendant Maxa informing him that Lewis' pain was being managed with chronic stable Methadone therapy, and Lewis alleges that his treatment with Methadone and Soma continued while at SCI-Albion until March 21, 2014, when he was transferred to SCI-Camp Hill on a writ. *Id.* at ¶¶ 18-19, 21. Lewis' prescriptions for Methadone and Soma were discontinued while he was at SCI-Camp Hill from March 21, 2014 to April 8, 2014. *Id.* at ¶ 20. When he returned to SCI-Albion, Lewis submitted an inmate request to Maxa asking that his prescriptions for Methadone and Soma be re-ordered because he was in a lot of pain. *Id.* at ¶ 22. Maxa responded that all narcotics and muscle relaxers required the approval of the Regional Medical Director. *Id.* On April 17, 2014, Maxa assessed Lewis as having chronic neck pain, which Maxa planned to treat with nonsteroidal anti-inflammatory drugs ("NSAIDs") and Elavil. Defendant Maxa indicated that he would prescribe Robaxin (a muscle relaxant) for Lewis for two weeks. *Id.* at ¶ 24. Later

3

that month, Lewis wrote to Maxa complaining about not having appropriate pain medication, but Maxa responded that he could no longer get Soma and was weaning patients off opioid-based pain medications. Instead, Maxa wrote Lewis a prescription for Relafen, an NSAID, as a substitute because Celebrex, another NSAID, was unavailable. *Id.* at ¶ 25.

On May 4, 2014, Lewis sent another request to Maxa stating that the Relafen was not working and complaining that he could not sleep or cope with his everyday activities because he was in so much pain. *Id.* at ¶ 26. Lewis was then seen by Maxa for a follow-up on his chronic neck pain, but Maxa refused to prescribe any narcotic medication. *Id.* at ¶ 28. Lewis sent an inmate request to Maxa complaining that he was suffering "physically and mentally" and asking to be put back on Methadone and Soma twice daily. *Id.* at ¶ 29. Maxa responded, conveying that Lewis was on his "call out" list. *Id.* at ¶ 30. Lewis was next seen by Maxa on May 30, 2014, as a follow up to Lewis' complaint of continuing chronic neck pain and to discuss his request for Methadone and Soma, which Lewis had not been using since March 21, 2014. *Id.* Maxa observed that Lewis exhibited "no changes from prior exams" and again refused to prescribe any narcotic medication for Lewis' chronic pain. ECF No. 21 at ¶ 31.

On May 20, 015, Lewis sent a request to Maxa asking that he prescribe Methadone and Soma for his chronic pain. *Id.* at ¶ 32. Maxa responded that "We have already discussed this and they are not going to be reviewed at this time." *Id.* at ¶ 33.

C.      Defendants' Statement of Material Facts

Defendants' Concise Statement of Material Facts contains one-hundred and two separate averments, largely relating Lewis' history of medical treatment while in the custody of the Department of Corrections. *See* ECF No. 44. Lewis does not dispute any of these factual statements. *See* ECF No. 46, ¶¶ 1-102. The Court, therefore, will summarize the facts relevant

4

to the issues presented in the Defendants' motion. Statements describing medical care Lewis received for issues unrelated to this case will not be recounted unless relevant to the discussion.[1] Because Lewis does not dispute the Defendants' statement of facts about his medical history, the Court finds that statement and the medical history undisputed for purposes of the Defendants' motion for summary judgment. *See* Fed. R. Civ. P. 56(e)(2).

When Lewis entered the Pennsylvania penal system, he was examined. ECF No. 44 at ¶ 2. A medical history was taken which revealed that Lewis was in a motorcycle accident in 2001. *Id.* Following his accident, Lewis underwent surgery on his neck and spine. *Id.* Lewis' medical history also revealed the various medications he was taking at that time: acetaminophen-codeine; Naproxen; Albuterol Sulfate; selenium sulfide shampoo; Norvasc; hydrochlorothiazide, Prozac; Verapamil; Lopressor; hydralazine; docusate sodium; methocarbamol (Robaxin); Cardura; Doxepin; and Zocor. *Id.*

Lewis was evaluated by a physician assistant at SCI-Camp Hill in December of 2011. *Id.* at ¶ 4. He complained of pain in his left arm and back. *Id.* After noting Lewis' prior surgery and x-ray evidence of an anterior spinal fusion, the PA prescribed Motrin. *Id.* Lewis was medically cleared to be transported to SCI-Albion in March of 2012. *Id.* at ¶ 7. Upon arrival at SCI-Albion, Lewis' medications included: Prozac; Mevacor; Lopressor; Motrin; Norvasc; Colace; Cardura; and Doxepin. *Id.* at ¶ 8.

In April of 2012, Lewis was medically released to the Community Corrections Center—a half-way house. *Id.* at ¶ 11. Lewis was again evaluated by prison medical personnel in October

---

[1] Lewis' medical history is extensive. Aside from treatment for his chronic pain, Lewis received treatment for, among other ailments, stomach and acid reflux (ECF No. 43-1, at 65, 94); flatulence (ECF No. 43-1, at 88); hypertension (*Id.* at 62, 83-84); skin and scalp conditions (*Id.* at 82); hyperlipidemia (*Id.* at 61, 81); hernia (ECF No. 43-2 at 119, 156); seizure disorders (*Id.* at 113, 149, 151); prostrate examination (*Id.* at 136); an abscess on his elbow (*Id.* at 132); podiatric care (*Id.* at 125); and respiratory infection (*Id.* at 80).

5

of 2012. His history of neck surgery and use of pain medication were noted. *Id*. at ¶ 12. It was also noted that Lewis had been treated at the Hershey Medical Center's Pain Management Clinic and by his primary care physician for chronic pain. *Id*. Prison medical staff ordered that Lewis' records from those providers be sent to SCI-Albion. *Id*.

Lewis was again seen by prison medical staff in November of 2012. *Id*. at ¶ 13. He complained of continued and persistent neck pain as well as radiculopathy to his left arm. *Id*. He also asked whether the records from his primary care physician and Hershey Medical Center had been received. *Id*. It was noted that Lewis reported four prior neck surgeries and that he had once been prescribed Methadone. *Id*. The prison also reported having received Lewis' outside medical records. *Id*. A follow-up visit with Maxa was scheduled. *Id*.

Maxa saw Lewis on November 30, 2012, and noted his previous surgeries. *Id*. at ¶ 14. Lewis requested a prescription for Methadone. *Id*. Maxa noted that Lewis was ambulatory, could get in and out of a chair with ease, could get up and down from the exam table without problem, and had a good range of motion. *Id*. Maxa reviewed Lewis' records from the Hershey Medical Center. *Id*. He prescribed Naprosyn and Ultram for Lewis and planned to follow-up in four to six weeks. *Id*.

Lewis was seen again in January of 2013 and continued to complain of pain. *Id*. at ¶ 15. He reported no relief from the Ultram prescription. *Id*. Lewis reported difficulty in getting to meals because of his chronic neck pain. *Id*. Maxa noted Lewis' slow ambulation. *Id*. The Ultram prescription was discontinued and Maxa ordered Methadone (20 mg) for Lewis. *Id*. By the end of January, 2013, Lewis was reporting improvement in his pain levels. *Id*. at ¶ 17. He was getting in and out of bed easier. *Id*. Maxa noted, however, a decrease in Lewis' range of motion. *Id*. Maxa increased Lewis' daily Methadone intake to 60 mg. *Id*.

6

Lewis met with Maxa again in April of 2013 to discuss his continued neck pain. *Id.* at ¶ 21. Lewis reported spasms and pain in his left arm. *Id.* Maxa noted a decrease in Lewis' range of motion and gave Lewis a prescription for Flexeril. *Id.* In May of 2013, Maxa ordered injections of Kenalog in Lewis' left trapezius muscle. *Id.* at ¶ 23. Maxa also ordered a prescription for Lyrica be added to Lewis' medication regimen in July of 2013 after Lewis complained of continuing pain in his left arm. *Id.*

In August of 2013, Maxa ordered a series of x-rays of Lewis' cervical and thoracic spine after Lewis reported an increase in his pain levels. *Id.* at ¶ 25. Maxa discontinued Lewis' prescription for Lyrica, as Lewis reported no relief. *Id.* Warm, moist compresses were also ordered and a decision about physical therapy was delayed until Lewis' next appointment. *Id.* X-rays showed osteopenic and degenerative changes, but no sign of any fractures. *Id.* at ¶ 26. After reviewing these x-rays, Defendant Maxa ordered Caltrate and Soma for Lewis to further alleviate his complaints of pain. *Id.* at ¶ 30.

By March of 2014, Defendant Maxa noted improvement in Lewis' ambulatory abilities and that Lewis had not been taking his full daily Methadone dosage as prescribed. *Id.* at ¶ 37. Maxa decreased Lewis' Methadone dosage. A few weeks later, Lewis was transferred to SCI-Camp Hill. *Id.* At the time of this transfer, Lewis was taking the following medication: Atorvastatin, Calcium, Soma, Chlorthalidone, Doxepin, Methadone, and Metoprolol. *Id.* at ¶ 39. Lewis was seen by SCI-Camp Hill medical personnel shortly after his arrival. *Id.* at ¶ 41. He requested the pain medication he had been prescribed at SCI-Albion. *Id.* He was prescribed Naprosyn twice daily instead. *Id.* Lewis was transferred back to SCI-Albion a few days later. *Id.* at ¶ 42. Upon return to SCI-Albion, Lewis met with Maxa and informed him that his prescription for Methadone and Soma had been discontinued during his brief stay at SCI-Camp

7

Hill. *Id.* at ¶ 44. Maxa noted that Lewis continued to have muscle spasms in his neck and ordered Prilosec, NSAIDS, and Elavil. *Id.* Maxa did not re-prescribe Methadone and Soma. *Id.*

Lewis was again transferred to SCI-Camp Hill in June of 2014. *Id.* at ¶ 48. While there, Lewis had a seizure. *Id.* at ¶ 50. After being observed in the infirmary overnight and educated on the importance of adequate hydration, Lewis was released from the infirmary. *Id.* Six days later, he was transported back to SCI-Albion. *Id.* at ¶ 52.

Maxa saw Lewis again in July of 2014 for continued neck pain. *Id.* at ¶ 55. Lewis again requested treatment with Methadone and Soma. *Id.* After noting Lewis' history of seizures and passing out, and that Lewis had been off of Methadone and Soma since March 21, 2014, Maxa declined to provide those medications, ordering an increased dose of Naprosyn, Nortriptyline, and introduced Tegretol into Lewis' medication regimen. *Id.*

In September of 2014, Maxa examined Lewis for suspected seizures. *Id.* at ¶ 59. Maxa increased Lewis' Tegretol dosage and ordered an EEG. *Id.* In October of 2014, Lewis was seen by a physician at an outside neurological practice, who performed the EEG. *Id.* at ¶ 60. The results of this test were normal. *Id.*

Maxa examined Lewis again in January of 2015. *Id.* at ¶ 64. Lewis continued to complain of neck pain, and reported no improvement since his last visit, the Naprosyn being ineffective. *Id.* Maxa changed Lewis' prescription to Voltaren. *Id.* Lewis was taking the following prescription medications: Amlodipine, Atorvastatin, Calcium, Tegretol, Voltaren, Doxepin, hydrochlorothiazide, Metoprolol, Nortriptyline, and omeprazole. *Id.* at ¶ 65.

Lewis continued to receive regular medical care for various other ailments not directly related to his neck pain. *Id.* at ¶ 65-93. In July of 2016, Lewis again requested a prescription for

8

Methadone and Soma. *Id.* at ¶ 94. Prison medical personnel noted that Lewis had not been on those medications for years and that he was currently treating with Voltaren and Tegretol. *Id.*

In December of 2016, Lewis met with another prison physician (Dr. Boggio) and complained of neck pain. *Id.* at ¶ 100. Lewis again requested a prescription for Methadone. *Id.* A physical examination revealed that Lewis was alert, orientated, had no tenderness, could move his arms, and could touch the back of his neck. *Id.* He was diagnosed with mild osteoarthritis and prescribed NSAIDS for his pain. *Id.* The physician noted that Lewis "blames me to stop Methadone, but it was stop [sic] by somebody else." *Id.* Lewis' Voltaren prescription was renewed. *Id.* at ¶ 101.

D. Plaintiff's Statement of Material Facts

Lewis filed a Responsive Concise Statement. ECF No. 47. Because Defendants failed to respond or otherwise oppose any of the averments set forth in Lewis' Responsive Statement, those averments are considered admitted. *See* LCvR 56(C)(1)(a) and 56(E). Lewis states that he has never used any other prescription medications to treat his pain, other than those prescribed for him from prison physicians. ECF No. 47 at ¶ 103. Furthermore, no medical provider has expressed concern that Lewis was misusing or abusing Methadone or Soma. *Id.* at ¶ 105. And the risk of an inmate abusing those medications is slight given the manner and procedures in place within the prison system to control the use of those narcotics. *Id.* at ¶ 106. As for the reduction in dosage of the Methadone, Lewis states that he believed he could function on two doses a day and later agreed with Maxa to reduce his daily intake. *Id.* at ¶¶ 107-08. Maxa never stated that the reduction in dosage was because Lewis was abusing the medication. *Id.* at 109.

9

Lewis submitted an Inmate Request to Staff form asking Maxa to reorder his Methadone and Soma prescriptions because he was continuing to experience pain. *Id.* at ¶ 111. Maxa responded that "you are on my schedule to discuss. I see that the meds were discontinued 3/21/14. With the new directive all narcotics and muscle relaxers are approved or denied by the Regional Medical Director." *Id.* at ¶ 112. Lewis continued to communicate with Maxa, asking again for Soma as "I need something besides Elavil for pain. I'm really hurting." *Id.* at ¶ 114. Maxa responded that "I cannot get [S]oma any longer. I am weaning people off narcotics and Neurontin daily. I wrote for Relafen as Celebrex is not available." *Id.* at ¶ 115. Lewis wrote to Maxa again stating "you are going to have to do better than this Relafen. I have been off the [M]ethadone and [S]oma for 5 weeks and I can't sleep I'm in so much pain I'm miserable. I can't cope with my everyday activities. Please do something I can't take much more stress." *Id.* at ¶ 116. Maxa responded by telling Lewis he "was on my call out." *Id.* Lewis again informed Defendant Maxa of his continued pain: "This pain is affecting me physically and mentally. I can't stay in bed for 16 and ½ to 46 years. I want a simple answer, will you put me back on the [M]ethadone and [S]oma twice daily, yes or no? I also need the name and title of whoever took me off my meds and their address, Regional Medical Director." *Id.* at ¶ 117-18.

III. Summary Judgment Standard of Review

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The moving party, here the Defendants, bears the

10

initial burden of identifying evidence or the lack thereof that shows the lack of a genuine issue of material fact. *National State Bank v. Federal Reserve Bank of New York*, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

Thus, the inquiry involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting *Anderson*, 477 U.S. at 251-52)). If a court, having reviewed the evidence with this standard in mind, concludes that "evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. *Id.* at 249-50.

IV. Discussion

Maxa argues that he is entitled to summary judgment because Lewis merely disagrees with his prescribed course of treatment, and therefore no reasonable juror could find Maxa deliberately indifferent to Lewis' serious medical needs. *See* ECF No. 44, *generally*. Lewis claims that the record supports a finding that Maxa provided inadequate and ineffective medical care with deliberate indifference, violating his rights under the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97 (197).

11

A. Eighth Amendment Claim Against Defendant Maxa

The Eighth Amendment "requires prison officials to provide basic medical treatment" for incarcerated persons. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citation omitted). To establish an Eighth Amendment claim based on inadequate medical care, a plaintiff must show "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). Thus, to survive summary judgment on a claim brought under 42 U.S.C. § 1983 alleging that prison officials have violated the Eighth Amendment rights of an inmate, that inmate must (1) show that his medical condition is "objectively, sufficiently serious" and (2) show that the defendant acted with a "sufficiently culpable state of mind." *Id*. at 834. *See also Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 2017). The subjective inquiry aspect of deliberate indifference is meant "to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

1. Serious Medical Need

The Defendants do not dispute that Lewis' medical needs were serious. And the record demonstrates that given his prior surgeries, Lewis' residual chronic pain presented a serious medical need requiring treatment. *See Washington v. Wolf*, 2017 WL 9487089, \*6 (W.D. Pa. Oct. 6, 2017)) (holding that chronic pain may be a serious medical need); *Reposh v. Sellers*, 2014 WL 4680703, \*5 (M.D. Pa. Sept. 19, 2014) (holding that surgery and later chronic pain satisfied the "serious medical need" requirement). The question before the Court today then, is whether

12

there is evidence on which a reasonable jury could rely to find Maxa acted with deliberate indifference to those needs.

## 2. Deliberate Indifference

Deliberate indifference to a serious medical need involves the "unnecessary and wonton infliction of pain." *Estelle*, 429 U.S. at 104. This indifference can manifest in an intentional refusal to provide care, in delaying medical treatment for non-medical reasons, in the denial of prescribed medical treatment or reasonable requests for treatment that result in suffering or risk of injury. *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993). Deliberate indifference can also be found where prison medical personnel continue with "persistent conduct in the face of resultant pain and risk of permanent injury." *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990).

When it comes to claims of deliberate indifference, there is a "critical distinction" between allegations of a delay or denial of a recognized need for medical care and allegations of inadequate medical treatment. *Pearson*, 850 F.3d at 535 (quoting *United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)). A claim alleging the delay or denial of medical treatment requires inquiry into the subjective state of mind of the defendant and the reasons for the delay, which like other forms of scienter can be proven through circumstantial evidence and witness testimony. *Id.* But "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.* (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). Furthermore, courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... [which] remains a question of sound professional judgment." *Inmates of Allegheny*

13

*Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44,

48 (4th Cir. 1977)) (alterations in original).

That said, as the Court of Appeals has made clear, the fact that prison medical personnel

have provided some medical care to an inmate does not preclude a finding of deliberate

indifference:

> [T]here are circumstances in which some care is provided yet it is
> insufficient to satisfy constitutional requirements. For instance,
> prison officials may not, with deliberate indifference to the serious
> medical needs of the inmate, opt for "an easier and less efficacious
> treatment" of the inmate's condition. *West v. Keve*, 571 F.2d 158,
> 162 (3d Cir. 1978) (quoting *Williams v. Vincent*, 508 F.2d 541, 544
> (2d Cir. 1974)). Nor may "prison authorities deny reasonable
> requests for medical treatment ... [when] such denial exposes the
> inmate 'to undue suffering or the threat of tangible residual
> injury.'" *Monmouth County Corr. Inst. Inmates*, 834 F.2d at 346
> (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)).

*Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir. 2017).

B.     Maxa's Motion for Summary Judgment

At the outset, the Court observes nothing in the summary judgment record to support a

finding that Defendant Maxa ignored Lewis' complaints of chronic pain. In fact, the record

confirms that he was seen, evaluated, and treated many times by prison doctors, nurses, and other

medical staff, and was provided with several medications throughout the time he complained of

being in pain. These medications included Methadone, Soma, Ultram, Naprosyn, Ibuprofen,

Motrin, and other prescription and over-the-counter medicines. Thus, Lewis cannot show on this

record that he was denied medical care, or that his serious medical needs were ignored.

Instead, Lewis can only argue that the care he did receive was inadequate. *See, e.g., Baez
v. Falor*, 2012 WL 4356768, at \*36 (W.D. Pa. Sept. 24, 2012); *Baily v. Fernandez*, 2012 WL
4802015, at \*5 (E.D. Ky. Oct. 9, 2012). That is, although Lewis was treated with many pain

14

medications to relieve his symptoms, he was dissatisfied with the results. *See, e.g.*, *id.*
Ordinarily a disagreement about the medical treatment provided to a prisoner does not rise to the
level of a constitutional violation. *Wisniewski v. Frommer*, 2017 WL 9534006, at *6 (M.D. Pa.
July 28, 2017) (citing *Sepulveda v. Harris*, 2011 WL 2689398 (N.D.N.Y. June 13, 2011). *See
also Inmates of Allegheny Cnty. Jail*, 612 F.2d at 762. For certain, Lewis would have preferred
Methadone and Soma to treat his chronic pain. But a prisoner has no right to receive
"unqualified access to [the] healthcare" of his or her choice. *Hudson v. McMillian*, 503 U.S. 1, 9
(1992). Instead, prison inmates are entitled only to "adequate care." *See Parkell v. Danberg*,
833 F.3d 313, 337 (3d Cir. 2016) (citations omitted). To show that Maxa acted with a
"sufficiently culpable state of mind," Lewis must put forth evidence establishing that Maxa knew
of a serious risk to his health and consciously disregarded that risk. *See, e.g., Wilson v. Jin*, 698
Fed. Appx. 667, 671 (3d Cir. 2017) (quoting *Rouse*, 182 F.3d at 197) (deliberate indifference
requires obduracy and wantonness ... which has been likened to conduct that includes
recklessness or a conscious disregard of a serious risk.").

When medical care is provided, as it was here, "[it is presumed] that the treatment of a
prisoner is proper absent evidence that it violates professional standards of care." *Pearson v.
Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017) (citation omitted); *Jones v. Tritt*, 2019 SL
719636, *11 (M.D. Pa. Feb. 20, 2019). Thus, Lewis must, as a threshold matter, produce
evidence establishing "that the defendant breached a professional standard of care." *Jones v.
Tritt*, 2019 WL 719636, *11 (M.D. Pa. Feb. 20, 2019) (quoting *Pearson*, 850 F.3d at 536). Such
evidence alone, however, is insufficient to support an Eighth Amendment violation based upon
deficient medical care. *Pearson*, 850 F.3d at 538 ("even if a reasonable jury could find that
Nurse Thomas was negligent in diagnosing or treating [plaintiff's] pain, that would not be

15

enough for the jury to find that Nurse Thomas acted with deliberate indifference in violation of the Eighth Amendment"). *Estelle* counsels that medical judgments by doctors or prison officials that later prove inappropriate or negligent are not alone sufficient to give rise to an Eighth Amendment claim. *See Estelle*, 429 U.S. at 104-07; *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (reiterating *Estelle*'s distinction between deliberate indifference to serious medical needs and "mere negligence"); *Durmer*, 991 F.2d at 67 (acknowledging that a deliberate indifference claim requires that a prisoner demonstrate "more than negligence"). Instead, the deliberate indifference standard requires "obduracy and wantonness," *Whitley v. Albers*, 475 U.S. 312, 319 (1986), which has been likened to conduct that includes recklessness or a conscious disregard of a substantial risk of serious harm. *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Accordingly, when some medical care is administered by officials that arguably falls below the generally accepted standard of care, that medical care is often sufficient to rebut accusations of deliberate indifference and preclude a finding of an Eighth Amendment violation. *Hankey v. Wexford Health Sources, Inc.*, 383 F. Appx. 165, 168–69 (3d Cir. 2010) (citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir.1990) (stating that prison officials and doctors will be given wide latitude to address the medical needs of inmates and that "it is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights")). The undisputed facts regarding the care provided by Maxa in this case precludes a finding of an Eighth Amendment violation.

        1.     Defendant Maxa's Care Did Not Rise to the Level of Deliberate Indifference.

In support of his claim, Lewis offers the affidavit of Ignacio Badiola, M.D., a physician practicing pain management and anesthesiology, who opines that Maxa's care in treating Lewis

16

fell below the accepted standard of care.[2] *See* ECF No. 45-3. Dr. Badiola offers his opinion that Maxa violated the standard of care by not consulting with a pain management physician "who could have recommended other modalities that may have been more effective" and by failing to obtain approval to re-prescribe Methadone and Soma for Lewis' pain. ECF No. 45-3, at 6. Dr. Badiola also states his belief that Maxa caused Lewis to suffer unnecessary pain by continuing to provide Lewis with ineffective medication. *Id.* at 5. He also submits his opinion that Maxa "acted with a conscious disregard for Mr. Lewis' serious medical condition, and that such conduct amounted to deliberate indifference." *Id.* In light of the undisputed facts of record regarding the care actually provided to Lewis, however, Dr. Badiola's affidavit is insufficient to raise a genuine issue of fact sufficient to defeat summary judgment.

The Court is unpersuaded by Dr. Badiola's conclusion that Maxa acted with deliberate indifference to Lewis' serious medical needs. *See* ECF No. 45-3 at 5. Whether the totality of the factual record is sufficient to support a jury's finding that Maxa's actions constituted deliberate indifference is a question of law for the Court. *See, e.g., Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999) ("A court examines the totality of inmates medical records when determining deliberate indifference"); *Newberry v. Melton*, 726 Fed. Appx. 290, 293 (6th Cir. 2018) (holding that Eighth Amendment deliberate indifference is a legal question); *Dennis v. Martin*, 2018 WL 3598770, *3 (N.D. Tex. June 22, 2018). Given the undisputed facts regarding the various medications and dosages Maxa prescribed to treat Lewis' chronic pain, Dr. Badiola's affidavit supports only a difference of medical opinion between two physicians about the course

---

[2] The Defendants have offered the affidavit of Marc Itskowitz, M.D., in support of their position that Maxa's actions in treating Lewis were well within the applicable standard of care. ECF No. 48-2. The Court has not considered this affidavit in deciding the pending motion as the Court finds based upon the totality of the undisputed evidence that the record cannot sustain a finding of deliberate indifference. *See, e.g., Leisure v. Lancaster Cty. Prison*, 650 Fed. Appx. 89, 91 (3d Cir. 2018) (holding that if prison nurses deviated from the standard of care, the deviation did not amount to deliberate indifference, but at most, negligence); *see also Pearson*, 850 F.3d at 541.

17

of Lewis' treatment or, at most, negligent pain management by Maxa. Dr. Badiola opines, for example, that Maxa should have consulted a pain management specialist. ECF No. 43-3, at 14. The mere fact that Maxa did not refer Lewis to see an outside specialist, however, does not support a claim of deliberate indifference. Such failures have been found, at most, to present an issue of negligence, which fails as a matter of law to state a federal constitutional claim. *Bailey v. Pennsylvania Dep't of Corr.*, 2011 WL 6937473, at \*4 (W.D. Pa. Nov. 29, 2011), report and recommendation adopted, 2012 WL 11105 (W.D. Pa. Jan. 3, 2012) (citing *Hood v. Prisoner Health Services, Inc.*, 180 Fed. Appx. 21, 25 (10th Cir. 2006) ("As the district court concluded, however, his factual allegations, which include ... refusal to send him to an outside specialist, cannot establish a constitutional violation"). *See also, Fabricio v. Griffing*, 2019 WL 1059999, \*6 (S.D.N.Y. March 6, 2019) (holding that disagreements over the need for medical specialists are not adequate grounds for a Section 1983 claim); *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). "Matters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing." *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006). While Dr. Badiola faults Maxa for not considering a referral to a pain specialist, this criticism would potentially support a finding of deliberate indifference only if the record included evidence that Maxa did not reasonably regard his treatment plan as appropriate. Dr. Badiola's affidavit offers nothing to satisfy the subjective component of deliberate indifference on this point, and Maxa's testimony and actions document that Maxa repeatedly added medications and adjusted dosages in an effort to address Lewis' chronic pain.

Lewis argues that the evidence of deliberate indifference against Maxa includes his ignoring a recommendation for Lewis' treatment from another physician. Certainly, "[p]rison

authorities may be deliberately indifferent when they prevent an inmate from receiving recommended treatment for serious medical needs." *Pearson*, 850 F.3d at 538 (citation omitted). But no such recommendation was made here. Lewis contends that his "previous pain management physician recommended and even wrote Dr. Maxa a letter explaining that he be prescribed Methadone and Soma for Mr. Lewis, but Dr. Maxa ignored that recommendation for no valid medical reason." ECF No. 45, at 9. That contention mischaracterizes the content of the letter. *See* ECF No. 48-1. Dr. Larien G. Bieber, Lewis' primary care physician, wrote to Defendant Maxa:

> I received a letter from one of the prisoners in your unit, John Lewis Jr., asking that I write to you concerning some of his past history. I was his primary care physician before he was incarcerated. At the time, he suffered from significant chronic pain and was on chronic stable Methadone therapy to treat this. He has asked me to inform you of this, and I am writing this letter in response to his request.

*Id.*[3] This letter is not a recommendation that Lewis be treated with Methadone and Soma for his chronic pain. It is instead a factual statement sent to Defendant Maxa relating two pieces of information: first, that Dr. Bieber was Lewis' primary care physician and second, that he treated Lewis with Methadone in the past. *Id.* Furthermore, Dr. Bieber does not suggest that he is a "pain management physician." *Id.* The letter contains no recommendation that Lewis be prescribed the narcotic and no prognosis that Lewis would respond favorably to the medication or that Methadone was the only medication that would alleviate his pain. Dr. Bieber wrote that Lewis asked him to inform Maxa of his prior treatment with the narcotic and that Dr. Bieber was

---

[3] Dr. Badiola acknowledges this letter, but renders no opinion on it as he admittedly did not review Dr. Bieber's records. *See* ECF No. 45-3, at 3.

complying with Lewis' request. *Id.* That is all. Thus, Maxa did not ignore a recommended course of treatment because Dr. Bieber made no recommendation.[4]

Finally, Dr. Badiola faults Maxa for "never attempt[ing] to obtain [] approval" for Methadone and Soma from the regional medical director. ECF No. 45-3, at 6. During his many consultations with Lewis, Maxa discussed his medical rationale for prescribing non-opioids to treat his chronic pain and not re-prescribing Soma and Methadone:

> Q. Did you consider at that time submitting a request to the regional medical director for either the Soma or the Methadone, since this had provided stable relief for Mr. Lewis for many years?
>
> A. No. As I recall, I talked to Mr. Lewis about other alternatives for his chronic pain, since the standards and the national consensus was not to treat the chronic pain with chronic opiates, and we would try other alternatives.

Doc. No. 43-3, p. 14. In response to Lewis' continued complaints of pain, Maxa prescribed new medications and increased the dosages of Lewis' existing medications. Doc. No. 43-3, pp. 17-18.

Badiola's view is that Maxa's reliance on Wexford's "bureaucratic process" amounted to deliberate indifference because it created an inappropriate, "non-medical delay to the provision of care." *Id.* The bureaucratic process Badiola references is Wexford's policy of requiring the approval of the Regional Medical Director for all opioid prescriptions. Lewis continues this argument, maintaining that Maxa was deliberately indifferent because he allowed a general policy directive to have priority over his independent judgment. *See* ECF No. 45, at 15. Maxa explained:

---

[3] And even if this letter did contain a recommendation to use Methadone to treat Lewis' pain, a prison doctor's use of a different treatment regimen than that prescribed by a private physician does not necessarily amount to deliberate indifference. *Johnson v. Cash*, 557 Fed. Appx.102, 104 (3d Cir. 2013) (per curiam) (citing *McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977)).

20

Q: So, is it your understanding that the standard of care changed, that opiates are no longer used for chronic pain?

A: They are not to be – they are not indicated to use for chronic pain unless there's no other alternative.

Q: Okay. And when you say they're not indicated, they're not indicated by who? Is that by the Commonwealth or Pennsylvania or the standard of practice.?

A: The standard of practice.

ECF No. 43-3, at 10.

Maxa further stated that:

Q: Well, did the DOC have to approve all narcotic prescriptions at some point?

A: The DOC doesn't have to approve them. If you put an order in for it, it has to be approved then by the regional medical director. Like, if I put in --- if I put in today a narcotic prescription ---

Q: Okay.

A: It would go to the regional director for approval.

Q: and does the regional medical director have to approve it?

A: Because it's non-formulary.

Q: What does the word formulary mean? I'm confused by the whole concept. I'm not trying to ---

A: Formulary is a list of all medications that you can just order without any prior approval. There might be blood pressure medicines. There might be heart medicines. There might be diabetic medicines. Those are the ones that the Department of Corrections has deemed suitable for treating these conditions, and they are the ones that are preferred to be used.

*Id.* at 11. This testimony reveals two things: first, any policy regulating opioid prescriptions for inmates was the policy of the Department, not of Defendant Maxa or the other Defendants. No

21

evidence has been presented by Lewis that these Defendants instituted such a policy or directive. Second, Maxa testified that nothing prohibited him from prescribing Methadone and Soma and Lewis cannot point to any evidence of record to contradict his testimony either. *See* ECF No. 43-3, at 11 (Q: Where you ever directed by anybody not to prescribe opiates? A: No."). What is lacking here is any competent evidence that a prescription for Methadone, and a specialist were the only medically acceptable treatment options for Lewis' pain. At most, he has shown a difference of opinion about the proper care for his complaints, and that does not amount to deliberate indifference.

Apart from Dr. Badiola's affidavit, Lewis also challenges the effectiveness of the medical treatment he received, arguing that Maxa was deliberately indifferent because he prescribed an ineffective medication regimen which ultimately left him in continued, unresolved, and debilitating pain. ECF No. 45, at 10-15. Lewis has filed a Declaration in which he states that Methadone and Soma were "the only medications that, to date, have relieved my chronic and debilitating pain." ECF No. 45-1, at ¶ 11. He also declares that the medications Defendant Maxa prescribed "were not effective at all in controlling my pain, and I knew the [M]ethadone and [S]oma had been very effective for pain relief in the past." *Id*. at ¶ 13. Finally, he states that when he "received my prescribed [M]ethadone and [S]oma the pain was less." *Id*. at ¶ 14. He presents no other evidence on the efficacy of these drugs in treating his chronic pain, or chronic pain in general.[5]

There are two problems with Lewis' argument. First, Lewis' medical records reflect that Maxa provided significant treatment for his chronic pain. This is not a case in which a course of

---

[5] The Court notes that the Federal Food and Drug Administration has recently ordered pharmaceutical companies to study the effectiveness of prescription opioids to quell chronic pain. *See* "FDA Takes Fresh Look at Whether Opioids Are Effective For Chronic Pain," *Washington Post*, 2/25/2019.

treatment was not being provided, and that Lewis was needlessly suffering pain as a result. *See, e.g., Tenon v. Driebelbis*, 606 Fed. Appx. 681, 687 (3d Cir. 2015) (prisoner's prescribed treatment of a soft diet and surgery were not being provided). Here, Maxa prescribed to Lewis a wide variety of medications in an effort to alleviate his pain and continually oversaw his treatment. The record shows that whenever Maxa was notified of Lewis' complaints of pain, he either prescribed additional doses of pain medication or added new medications to those Lewis was already taking. Maxa did not "insist on continuing courses of treatment that he knew were painful, ineffective or entailed substantial risk of serious harm to the prisoner." *White*, 897 F.3d at 109; *see also Pearson*, 850 F.3d at 541. Although Lewis may disagree with the specific medications he received, "[d]eference is given to prison medical authorities in the diagnosis and treatment of patients, and courts 'disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment.'" [6] *See Palakovic*, 854 F.3d at 227-228 (quoting *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)).

Second, while providing a less efficacious treatment may amount to deliberate indifference—for example where a prison physician treats a bone fracture with ice and pain

---

[6] Indeed, an inmate's objection to the type of medication provided by prison physicians is precisely the type of "disagreement between an inmate and doctors over alternate treatment plans" that falls well short of a constitutional violation. *Tillery v. Noel*, 2018 WL 3521212, at *5 (M.D. Pa. June 28, 2018). These types of claims often arise—and are routinely rejected—in the prison setting. *See, e.g., Whooten v. Bussanich*, 248 Fed. Appx. 324, 326-27 (3d Cir. 2007) (medical staff was not deliberately indifferent for treating migraine headaches with a medication other than the drug preferred by plaintiff); *Ascenzi v. Diaz*, 247 Fed. Appx. 390, 391 (3d Cir. 2007) (no deliberate indifference where plaintiff was provided pain medication and antibiotics instead of narcotic pain relievers for his herniated cervical discs); *Castro v. Kastora*, 2018 WL 4538454, at *6 (E.D. Pa. Sept. 20, 2018) (use of ibuprofen and Tylenol instead of Oxycodone or other narcotics did not amount to deliberate indifference; "[t]he medical staff did not withhold pain medication [but] merely exercised their medical judgment in providing [plaintiff] with a different medication than what he wanted."). This principle also extends to a prison physician's disagreement with an outside physician over treatment options. *See, e.g., White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990) ("If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness."); *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir.

23

killers, or throws away a prisoner's ear and stitches closed the stump of tissue that remains—the use of a less effective treatment is not deliberately indifferent when ordered as an exercise of a physician's professional judgment. *See Estelle*, 429 U.S. at 104 n.10. In other words, a particular medical treatment—while admittedly less effective—may still be constitutionally adequate if it is based on a prison physician's professional judgment, not on some improper purpose. *See, e.g., Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016) (quoting *Estelle*, 429 U.S. at 104 n. 10); *Tripp v. Corizon*, 2018 WL 5923988, at \*6 (S.D. Ind. Nov. 13, 2018). Based on the summary judgment record, a jury could not find that Maxa failed to exercise his professional judgment when deciding not to prescribe the narcotics Lewis requested. Maxa testified that there were several factors that he evaluated when considering whether to prescribe Methadone and Soma to Lewis. First, Maxa noted that the standard of care for treatment of pain had shifted away from long-term use of opioids to non-narcotic medications. Second, Maxa observed that Lewis had self-reduced the amount of Methadone he was taking in March of 2014, shortly before Lewis was transferred to SCI-Camp Hill.[7] Lewis does not dispute this. *See* ECF No. 46, ¶¶ 107-08. Thus, Maxa officially reduced Lewis' prescribed dosage.

Third, while at SCI-Camp Hill, Lewis was not taking Methadone or Soma. When he returned to SCI-Albion, Maxa made the professional decision to treat Lewis with alternative, non-opioid medications. And fourth, Lewis was objectively manifesting a material reduction in pain symptoms. The medical record from this time (from Lewis' return to SCI-Albion in 2014 until Maxa's transfer to another facility in 2016) contains Maxa's observations that Lewis was

---

1996) ("Physicians will disagree about whether a particular course of treatment is appropriate, or even if treatment if appropriate at all, but a disagreement in treatment alone will not support a constitutional violation.").

[7] Dr. Maxa testified that "We decreased his meds. We stopped the 1500 med line --- Soma, of his muscle relaxers, Methadone. Since he's not been taking the seven o'clock meds, therefore, he was going to take it twice a day. We'll see how he does. There's actually no change in the total daily dose since he usually takes it twice a day anyway." ECF No. 43-3 at 9.

ambulating without difficulty, could get on and off of the exam table with no assistance, and was moving his head and neck without difficulty. *See* ECF No. 43-3, at 9. Maxa had the overall impression that Lewis was doing better. *Id.* Given these considerations, Maxa's decision to no longer prescribe Methadone and Soma for Lewis' pain is not an "unnecessary and wanton infliction of pain," but a reasoned medical judgment.

In sum, Lewis has not presented evidence sufficient to support a triable issue that the medical care and treatment he received rose to the level of deliberate indifference. Summary judgment will therefore be entered in favor of Defendant Maxa and against Plaintiff Lewis on Lewis' Eighth Amendment claim.

C.      State Law Negligence Claims

Defendants have also moved for summary judgment on Lewis' claims of professional negligence. Ordinarily the Court has discretion over whether to entertain supplemental jurisdiction over state claims filed with and arising out of the same facts as § 1983 actions. *Kitchen v. Chippewa Valley Schs.*, 825 F.2d 1004 (6th Cir. 1987). But when a plaintiff has no federal cause of action, a district court may exercise its discretion to dismiss his pendent state law claims. *Coleman v. Tice*, 2018 WL 5724125, at *7 (W.D. Pa. Oct. 10, 2018); *United Mine Workers of America Gibbs*, 383 U.S. 715, 726 (1966); 28 U.S.C. § 1367(c)(3). As to Lewis' claims of negligence under Pennsylvania law, the Court declines to exercise supplemental jurisdiction because no federal cause of action now exists. *See Aliperio v. Bank of America, N.A.*, 2019 WL 949083 (3d Cir. 2019); *see also Walsh v. Walsh*, 2019 WL 581551 at *2 (3d Cir. 2019).

V.    Conclusion

Defendant Maxa's motion for summary judgment will be granted as to Count I. Lewis'

claims of professional negligence against Wexford, Correct Care, and Maxa at Count II will be

dismissed without prejudice. An appropriate order will issue separately.

RICHARD A. LANZILLO
United States Magistrate Judge

Entered this 26th day of March, 2019.